IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JOSEPH DESOTO, M.D., Ph.D, | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | Civil No. RWT-10-3208 |
| v. | : | |
| | : | |
| DEPARTMENT OF DEFENSE, | : | |
| | : | |
| **Defendant.** | : | |

...oOo...

### Declaration of Ada Sue Hinshaw

I, Ada Sue Hinshaw, make the following declaration based on my personal knowledge. I understand that this declaration may be submitted to the United States District Court for the District of Maryland in relation to a law suit filed by Dr. Joseph DeSoto. If called as a witness, I would be competent to testify to the following:

1.  I am Dean at the Graduate School of Nursing (GSN) of the Uniformed Services University of the Health Sciences (USUHS) in Bethesda, Maryland.

2.  Since June of 2008, I have been Dean of the Graduate School of Nursing at the Uniformed Services University for Health Sciences (USUHS). I have held administrative positions for the past twenty years in nursing education and research; i.e., seven years as the first permanent Director of the National Center of Nursing Research and the first Director of the National Institute of Nursing Research at the National Institutes of Health, twelve years as the Dean of the School of Nursing at the University of Michigan and now in my third year as Dean of the GSN at USUHS.

3.  In my capacity as the Dean of the GSN, I am responsible to discharge the functionally relevant components of any higher education enterprise; exemplary educational pursuits, high quality research and service within the University environment. Our mission states; "The Graduate School of Nursing is a diverse interdisciplinary community providing the nation with the highest quality, advanced practice nurse clinicians, scientists and scholars dedicated to the Federal Health Service." In December of 2008, the GSN faculty developed the strategic imperatives for the School and the guiding principles to which faculty would be committed. Five strategic imperatives were developed: (1) education/curriculum including accreditation (2) research/scholarship, (3) faculty/personnel development, (4) infrastructure/information

1

**Def. Exhibit 1**

technology and (5) collaboration. The guiding principles included teamwork, respect, integrity, communication and excellence in all pursuits.

4.     The faculty and student body reflect the integration of two distinct cultures; i.e., the uniformed service military which represents the broader interests of the Department of Defense and the academic component found within comparable institutions all throughout the United States. Both sets of values must be understood and respected.

5.     The faculty consists of both military and civilian individuals. These professional educators are experts in advanced practice nursing as nurse practitioners or clinical nurse specialists as well as nurse scientists who are research experts with a cognate field of specialized study. The faculty is prepared with Master's degrees and/or doctoral degrees. In the fall and spring semesters of 2009-2010, there were approximately 30 faculty in the GSN.

6.     The GSN student body consists of military officers from each of the uniformed services (Army, Navy, Air Force and the Public Health Service). The GSN student body has typically been in the service for 6-10 years and come to USUHS to complete a Master's degree in Nurse Anesthesia, Family Nurse Practitioner, Psychiatric Mental Health Nurse Practitioner or Peri-operative Clinical Nurse Specialist. Other students are enrolled in the Doctor of Philosophy (Ph.D.) program. These students include uniformed individuals as well as individuals from the Veteran's Administration (VA). Most of the students in either of the two types of programs have strong clinical experience, early leadership positions, and many have been deployed overseas. In 2009-2010, there were approximately 160 students in the GSN.

7.     The primary responsibilities for the Dean of the GSN include leading and managing the educational and research mission of the GSN. In terms of education, the following represent the Dean's key functions: to select qualified applicants for educational programs through established processes; ensure quality curricula for the Master's and Doctoral programs through review and accreditation processes; and recruit and appoint qualified faculty to accomplish the educational mission. In terms of the GSN's research mission, the Dean oversees the establishment and facilitation of research programs for faculty support and evaluates research productivity and progress. In my experience, another major responsibility of a Dean is to promote and nurture a positive scholarly environment for the benefit of faculty and students so as to be productive in the educational and research missions.

8.     Dr. Charles Rice, the President of the USUHS, specifically recruited me for two key functions: (1) to develop the research support system for faculty and (2) to facilitate building the nursing research base within our faculty to strengthen the GSN Ph.D program at USUHS. Both I and Dr. Rice have placed a major emphasis on faculty submitting grants for research and publishing in peer reviewed journals. For example, when I was first introduced to the total faculty, I outlined my primary purpose in coming; i.e., research and that I would initially commit

**Def. Exhibit 1**

to three years. The faculty's response was quite positive. When appointed as Dean of the GSN, my early actions to strengthen the research program included:
- Establishment of the Faye G. Abdellah Military and Federal Research Center.
- Appointed an Acting Associate Dean for Research (a new GSN position)
- Recruited/employed a senior, NIH funded nurse scientist/faculty member as Associate Dean for Research
- Initiated recruitment of senior/junior faculty with established or potential research careers.

As a results of these endeavors, increased research productivity has occurred. For example, the amount of research funding increased by 41% over 2 years. The number of faculty grant submissions increased by one-third and the number of submissions for research based publications has increased over ten-fold (from 1 to 14).

9.   I am aware that Dr. Joseph DeSoto, formerly a faculty member at the GSN, has filed a complaint in federal court, including allegations of discriminatory treatment and retaliation. To my knowledge, Dr. DeSoto was never discriminated against nor was he the subject of retaliation by anyone at this school. I am aware that Dr. DeSoto's car was painted/vandalized with a religious slur—an act that is totally unacceptable in any setting. Upon being made aware of the vandalism, I and my staff cooperated fully with the investigation which followed.

10.   Before I arrived at the GSN, Dr. DeSoto was hired into a non-tenure track, term-limited appointment as an assistant professor in the GSN. When hired, the expiration of his term-limited appointment was June 30, 2010.

### Decision Not To Re-Appoint

11.   I made the decision not to re-appoint Dr. DeSoto at the end of his term-limited appointment. As a practical matter, the GSN had other professors who could teach Dr. DeSoto's courses. Additional factors also weighed in my decision to allow Dr. Desoto's appointment to lapse. Those factors included but were not limited to the following: (a) Dr. DeSoto's limited research performance once he became a member of the GSN faculty; (b) his inexplicably aggressive and at times openly hostile treatment directed towards other USUHS employees; (c) his failure to properly safeguard government property; and (d) his baseless criminal accusations against several members of the faculty. Each of these reasons is explained below.

### Limited Research Performance.

12.   Initially, I was impressed with the grant that Dr. DeSoto had earned and brought with him when he came to USUHS. I was hired to improve just such research productivity. In addition, when he was first employed by USUHS, Dr. DeSoto received a start-up research package. In total, he had approximately $700,000 to support his research.

**Def. Exhibit 1**

13.     Within four months of taking the position as Dean, I concurred with Dr. DeSoto's request to switch from the tenure-ineligible track to the tenure-eligible track. I based this decision in large part on the research grants Dr. DeSoto had brought with him. I wanted to encourage a faculty member who appeared to be embracing the new emphasis on research that I was hired to promote.

14.     In October, 2009, Civilian Human Resources (CHR) returned the package containing Dr. DeSoto's request to switch to the tenure-eligible track to the GSN bcause it had not been done properly. It lacked a recommendation as to the extent of the probationary period that had been satisified by his time spent in the tenure-inelibible track position and because it had not been acted upon by the faculty Committee on Appointments, Promotion, and Tenure (CAPT). The CAPT committee met on an infrequent basis.

15.     At that time, I took a fresh look at his research performance and his resume. I reviewed his entire list of publications. I saw that Dr. DeSoto had been unproductive in his two plus years of research at the GSN. His peer-reviewed, data-based publications were limited, and only one grant had been submitted. Dr. Hepler maintains a copy of the resume I reviewed, with my annotations.

16.     On October 22, 2009, I counseled Dr. DeSoto regarding his limited scholarly productivity. During the meeting, I told Dr. DeSoto that with the amount of research funding and support provided to him, much more was expected of him. While Dr. DeSoto had made presentations at several conferences, publications in peer-reviewed journals and applications for additional grants are the major products of research. Without such production, continued investment in Dr. DeSoto's research would be a poor use of research funding. The substance of that meeting was recorded in a memorandum to file by Colonel Bruce Schoneboom, who also attended the meeting.

17.     Months later, prior to the expiration of his three year appointment, Dr. DeSoto had reported no additional publications. Also, he had not applied for any additional grant applications. I am personally aware of a faculty member's productivity because all grant applications and submitted manuscripts for publication are signed off by me as Dean having been submitted through either the Associate Dean for Research or Academic Affairs.

**Aggressive and Hostile Treatment of Others**

18.     Several aggressive, accusatory incidents occurred between Dr. DeSoto and other faculty and staff colleagues both within the GSN and the wider University community. Within the GSN, a pattern of troubling behavior was evident. When involved in professional disagreements with faculty colleagues or staff, Dr. DeSoto would engage in intimidating behavior. For example, he would often stand or lean over the individual he was speaking with, raise his voice, raise his hand, thrust his finger in the individual's face, make personal accusations, and speak in an

**Def. Exhibit 1**

overall disrespectful manner and tone. The following examples are illustrative of Dr. DeSoto's unprofessional demeanor.

19.     In the fall of 2007, before I arrived at the University, several of Dr. DeSoto's colleagues were concerned about his poor treatment of the cleaning staff. In particular, he had verbally abused one of the women who cleans offices within the GSN. Dr. Hepler was made aware of this incident, retained emails regarding it and informed me of it.

20.     I witnessed this behavior in one of my earliest Faculty Council meetings in 2008 when Dr. DeSoto directed anger toward a GSN colleague, Dr. Gloria Ramsey. I counseled Dr. DeSoto following that meeting and stated that such behavior was not acceptable. I advised him that he could certainly disagree but he had to do so in a constructive and respectful manner. Dr. DeSoto replied that he understood and would monitor his behavior.

21.     In October 2008, in an exchange of emails among members of the Faculty Senate, Dr. DeSoto illogically accused a respected faculty member of the School of Medicine of being a "racist." The faculty member had suggested that not allowing non-billeted faculty to vote in Faculty Senate elections amounted to "disenfranchising" those individuals. Dr. DeSoto's over-the-top reaction to this benign opinion of a peer was wholly inappropriate, unprofessional, and created an atmosphere of hostility among the email recipients.

22      In late June 2009 when personnel from the University Safety and Occupational Health Department performed an unannounced, routine inspection of Dr. DeSoto's research lab. The lab was found to have some safety violations. At the time, Dr. DeSoto was on a trip presenting at a conference in China. When notified by email of the discrepancies in his lab, Dr. DeSoto demanded an apology for the outrageous violation of due process and invading his personal property.

23.     Another example of unprofessional behavior occurred in a January 14, 2010 GSN Student Promotion Committee (SPC) meeting, Dr. DeSoto's belligerent style again emerged. Dr. DeSoto supported a student who had been brought before the SPC for academic deficiencies. Dr. DeSoto not only adopted an aggressive tone, but ultimately yelled his opinions in front of the entire committee. Based on emails related to the incident and its aftermath, it appears that Dr. DeSoto was being intentionally provocative. While I did not witness this behavior, I received, and Dr. Hepler has retained, many memos and letters from faculty who were present. In short, each person expressed tremendous dismay over the sheer degree of Dr. DeSoto's unprovoked aggression and his accusatory manner. One of my faculty members shared grave concern over Dr. DeSoto's stability and believed he posed a "potential safety risk" and also feared "professional reprisal." After receiving these reports, I counseled Dr. DeSoto concerning his antagonistic, aggressive behavior and charged him to be part of building a strong, positive working environment.

Def. Exhibit 1

24. These are just some of the examples of Dr. DeSoto's aggressive, accusatory, and unprofessional behaviors that were a part of his overall pattern of interaction between professional colleagues and other University personnel. Dr. DeSoto's aggressive behavior was of such concern, it was one of the factors resulting in a University workshop offered to faculty and staff on how to deal with bullies and violence in the workplace. Given that one of the key functions of a Dean is to facilitate a strong and positive working environment for faculty and students, Dr. DeSoto's behavior is a significant reason I chose to let his three-year term-limited appointment lapse. Such behavior was not conducive to a good working environment.

### Failure to Safeguard Property

25. Dr. Hepler reported to me that Dr. DeSoto had lost or misplaced several laptop computers. Two were reportedly stolen in June 2009 and additional computers were unaccounted for. In June 2009, an Orange County Sheriff's report verifies that while Dr. DeSoto was on a University-funded trip to a professional conference in Florida, Dr. DeSoto's rental car, with two laptop computers inside, was stolen one evening when he was receiving a lap dance.

### Unsubstantiated Criminal Accusations Against Other Faculty Members.

26. Part of Dr. DeSoto's aggressive, accusatory behavior included criminal accusations against faculty colleagues. This was illustrated when he became angry with Colonel Schoneboom, who, in the role of Acting GSN Dean, ended one of Dr. DeSoto's lectures early after receiving a student complaint. Within 48 hours Dr. DeSoto made several criminal accusations against Col. Schoneboom. These accusations were immediately investigated by USUHS and found to be wholly without merit per the Brigade Commander's investigation.

27. Dr. DeSoto accused several faculty members of the heinous act of spray painting his car with a religious slur in April 2010. Dr. DeSoto spoke to students and listed a number of faculty members he thought had committed the crime — these accusations were made with no supporting evidence. On the last day of class, he informed students that some GSN faculty were about to be arrested for this crime. This was reported by students. No such arrests occurred. This served to confirm the propriety of my decision to allow Dr. DeSoto's appointment to expire.

28. In summary, I would never hire someone who had a record of conduct like Dr. DeSoto's. Nor would I reappoint them.

### Classroom Incident and Faculty Grievance Committee Report

29. Dr. DeSoto filed a complaint with the faculty grievance committee regarding Colonel Bruce Schoneboom's actions while serving as the Acting Dean of GSN on December 1, 2010. The Faculty Grievance Committee conducted an investigation pursuant to the complaint.

Def. Exhibit 1

30.     I believe the dispute was ultimately a matter of the clash of cultures (military v. academic civilian). It essentially involved Dr. DeSoto teaching a class as he thought best. Colonel Schoneboom, believing he was protecting his soldiers/students as he thought best, disagreed with the manner in which certain content was presented by Dr. DeSoto. Following the lecture which some students considered to be delivered in an inflammatory manner, Colonel Schoneboom, as Acting Dean, addressed the class at the point he thought the lecture was finished. The details of this incident are in the Faculty Grievance Committee report.

31.     In the academic culture, Dr. DeSoto has the right as the faculty member to choose how he presents content, as long as it is respectful and factual. Conversely, in the military culture, Colonel Schoneboom is responsible for the well being of those very same soldiers/ students who are in the GSN program. In short, disrespectful behavior is not acceptable within the military culture. Accordingly, and upon addressing the students' concerns, Colonel Schoneboom acted in a manner which was consistent with protecting young officers in his command. The two cultures clashed in this incident.

32.     The incident was complicated when, within two days of the lecture, Dr. DeSoto made unsubstantiated accusations of unrelated criminal behavior by Colonel Schoneboom. The criminal accusations were made to students, faculty, and staff. They were also made to Dr. Dale Smith, Senior Vice-President of the USUHS.

33.     On January 28, 2010, the Faculty Grievance Committee recommended that Colonel Schoneboom be required to formally apologize for the incident. Colonel Schoneboom was willing to apologize, but only so long as Dr. DeSoto would apologize for the baseless criminal allegations he had leveled against the Colonel. I believed the Faculty Grievance Committee's report was correct to find that Dr. DeSoto's academic freedom had been impinged upon. However, I also believe that Colonel Schoneboom thought he was doing the right thing by interceding on behalf of the complaining students. Accordingly, I met with Colonel Schoneboom and counseled him regarding faculty rights to deliver curriculum and alternative courses of action which could have been taken. Dr. Rice, USUHS President, concurred with my decision to counsel Colonel Schoneboom.

### Non-Renewal of Dr. DeSoto's Term-Limited Contract

34. The decision not to renew Dr. DeSoto's appointment was my decision made after consultation with General Bester, the Acting President of USUHS; Dr. Smith, the Senior Vice President of USUHS; and Darryl Brown, the Director of CHR. In spite of his strength as a teacher, the deficiencies noted in the paragraphs above were overwhelmingly negative. Dr. DeSoto's limited research productivity; his aggressive, accusatory behavior which is destructive to a positive work environment; his divisive nature with students and faculty; his loss of government equipment; and his unsubstantiated accusations against other USUHS and GSN faculty were all factors in my decision.

Def. Exhibit 1

35.  Dr. Hepler, my Executive Assistant, scheduled a meeting between me and Dr. DeSoto for March 19, 2010. The purpose of the meeting was to inform Dr. DeSoto that his appointment to the GSN faculty would not be extended beyond its expiration date and to provide him with a letter to that effect. While there was no requirement to so notify Dr. DeSoto since by its terms, his appointment expired on June 30, 2010 (known to him on the day he was hired), as a matter of academic courtesy, I wanted to provide him with ample opportunity to look for another position before the end of the semester. Dr. DeSoto denied knowing about the meeting and did not show up.

36.  On March 19, 2010, I sent Dr. DeSoto an email to reschedule the meeting for Thursday, March 25, 2010. Dr. DeSoto had told Dr. Hepler that the date and time were acceptable. My March 19th email on this topic is documented as being opened by Dr. DeSoto. Dr. DeSoto did not appear for the March 25th meeting either.

37.  On March 25, 2010, after he missed the agreed to March 25th meeting, I sent Dr. DeSoto another email offering him an opportunity to make an appointment with my secretary to discuss his status as a GSN faculty member. No appointment was ever made. In addition, the letter notifying Dr. DeSoto of the expiration of his appointment was attached to the March 25th email. This letter was also sent to his recorded addresses, to his lab, and a copy to his office.

### Vandalism Incident and Dr. DeSoto's Subsequent Behavior

38.  In late April 2010, someone vandalized Dr. DeSoto's car by painting on it the words "Die Jude" and a swastika. Dr. DeSoto's car was parked in the USUHS garage at the time. The incident was reported to me by a member of the faculty on April 23, 2010, the date of the incident. This was a heinous act of vandalism that the entire GSN staff and I condemn and take very seriously.

39.  Dr. DeSoto accused several faculty of committing that act. These accusations were made to GSN staff and reportedly to students as well. I attempted to speak with Dr. DeSoto on April 30, 2010 about his accusations and to deliver a letter documenting the behavior. The letter also instructed him to cease the grossly unprofessional accusations that were not only disruptive for faculty but might interfere with the ongoing Naval Criminal Investigative Service investigation of the incident. Given his past pattern of refusing to meet with me, I sent a staff member, Mr. Tim Jenkins, to escort Dr. DeSoto to my office.

40.  Dr. DeSoto refused to attend this April 30, 2010 meeting as well; this time telling Mr. Jenkins he had another mandatory meeting. He had enough time, however, to then spent approximately 20 minutes in a "chance" discussion in the parking garage speaking with Mr. Loman, Head of USUHS security.

**Def. Exhibit 1**

41. I sent Dr. DeSoto an email asking him to schedule an appointment to meet with me as soon as possible. At this point, Dr. DeSoto was basically refusing to respond to his Dean—having refused or not attended several previously-scheduled meetings. He finally scheduled an appointment the following Monday, May 5, 2010.

42. As a result of his public accusations following the vandalism incident and his refusal to follow my directions, Dr. DeSoto was placed on Administrative Leave with Pay from May 5, 2010 to the end of his term appointment on June 30, 2010. The conditions under which he could be on campus and complete his educational and research work were spelled out in the May 5th letter placing him on leave. The letter was delivered to him in a meeting on May 5, 2010. Dr. DeSoto only agreed to attend if accompanied by his lawyer (Ms. LaVonne Torrence) and the President of the Faculty Senate. Both came to the meeting. Dr. Hepler, my Executive Assistant, and Colonel Robert Thomson, the University President's Chief of Staff were also present. At no time did Dr. DeSoto ever deny that he had verbalized a list of names of people he suspected were involved in vandalizing his car.

43. Finally, I want to make one very important point. Other than in Dr. DeSoto's EEO complaint, I have never seen or heard a report that anyone on my staff referred to Dr. DeSoto's religion or ethnicity in a derogatory manner. Furthermore, I have never witnessed any such statements or actions. I would not tolerate any such statements or actions by anyone on the GSN staff.

I declare under the penalty of perjury that the foregoing is true and correct.

*Ada Sue Hinshaw*
Ada Sue Hinshaw, Ph.D.
Dean
Graduate School of Nursing, USUHS

Executed on /8 February 2011.

**Def. Exhibit 1**